IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| GREGORY H. SUTTON | * | |
| Plaintiff | * | |
| v. | * | Civil Action No. ELH-17-504 |
| SOMERSET COUNTY BOARD OF EDUCATION, *et al.* | * | |
| Defendants | * | |

******

**MEMORANDUM OPINION**

In a First Amended Complaint (ECF 22), plaintiff Gregory Sutton, who is African American, brings this race discrimination suit against his former employer, the Somerset County Board of Education (the "Board"), and its Superintendent of Schools, John Gaddis, Ed.D.,[1] defendants. He seeks an injunction, damages, a declaratory judgment, legal fees, and costs under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.*, as well as 42 U.S.C. §§ 1981 and 1983.

Defendants' motion for summary judgment is now pending. ECF 31. It is supported by a memorandum (ECF 35-1) (collectively, the "Motion") and numerous exhibits. Plaintiff opposes the Motion (ECF 36), supported by a memorandum (ECF 36-1) (collectively, the "Opposition"). He has also submitted numerous exhibits. Defendants have replied. ECF 41.

No oral argument is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons set forth below, I shall grant the Motion.

---

[1] Gaddis is sued in both his official and individual capacities.

# I. Factual Background

The Board is a corporate body politic organized and existing under the laws of the State of Maryland, which governs and has ultimate responsibility for the management, operation, and control of the Somerset County Public School ("SCPS") system. ECF 22 at 2, ¶ 5.[2] This includes the promulgation of all orders, rules, regulations, policies, and instructions related to the hiring, training, discipline, supervision and control of educators, principals, supervisors, and all other employees. *Id.*

Dr. Gaddis, who is Caucasion, has served as the Superintendent of the SCPS system since July 1, 2013. ECF 31-2 (Affidavit of Beth Whitelock, Board's Supervisor of Human Resources), ¶ 6; ECF 31-14 (Gaddis Deposition), at 4. Sutton is an African-American male who was employed by the Board as Supervisor of Transportation and Operations for the SCPS system from February 24, 2014 through June 30, 2016. ECF 31-2, ¶ 5; ECF 31-16 (Sutton Deposition) at 3, 7.

As Superintendent, Gaddis had the authority to appoint and to terminate the Supervisor of Transportation and Operations. *See* Md. Code (2018 Repl. Vol.), §§ 6-201(a)(1), 6-201(c)(1), and 6-202(a) of the Education Article ("Educ."); ECF 31-14 at 8; ECF 31-15 (Deposition of Board Chair Warner Sumpter), at 3.[3] Gaddis hired Sutton in February 2014 to fill the position of

---

[2] The Amended Complaint contains two paragraphs with the Number 5. *See* ECF 22 at 2, 4. Citations in this Opinion refer to the electronic pagination on the Court's CM/ECF system. The electronic pagination does not always correspond to the parties' exhibit numbers or the page numbers that appear on the submissions.

Also, the parties have submitted some of the same exhibits. I do not always provide duplicate citations.

[3] Defendants provided Sumpter's answer to an unknown question; defendants omitted the deposition page containing the question. Nevertheless, in context, I am satisfied that the question pertained to Gaddis's authority.

Supervisor of Transportation and Operations. ECF 31-2 at 4-5, ¶¶ 15, 25; ECF 31-14 at 5-8. However, when Sutton reported to work on February 24, 2014, Sutton learned that he was hired as the "Interim" Supervisor of Transportation and Operators. However, the job was not posted as an "Interim" position. *See* ECF 36-5 (Declaration of Sutton), ¶ 5; ECF 36-7 (Memorandum of Understanding); ECF 36-6 (job posting and duties). Moreover, according to plaintiff, his salary was at the bottom of the advertised range, and did not give him "credit for [his] forty-plus years of experience in working in transportation . . . ." ECF 36-5, ¶ 12.

Also on February 24, 2014, Sutton and the SPCS executed a Memorandum of Understanding, by which Sutton was appointed to the position. ECF 36-7. As part of his duties, Sutton was responsible for administering and overseeing the Board's Transportation Department, which included numerous bus contractors, drivers who operated 32 school buses, and bus routes that serviced nearly 3,000 students attending ten public schools throughout the county. ECF 31-6 (Sutton's response to request for admissions of facts), at 3. *See also* the Code of Maryland Regulations ("COMAR"), § 13A.06.07.01B(30) (defining "Supervisor of Transporation").

On November 16, 2015, an incident involving two students occurred on a school bus operated for SCPS by Eugene Borden, an African American bus driver. ECF 31-6 at 6. The incident was reported to Sutton by the parent of one of the students. *Id.*

Sutton met with Borden on November 18, 2015, to discuss the incident and to review a videotape of it. *Id.* at 7. Later that day, Sutton issued a letter of suspension to Borden, which summarized both the incident and the meeting. ECF 31-7; ECF 36-13 (same). Sutton recounted that a parent complained that a student twisted the arm of a female student and "left bruises,"

---

In addition, defendants cite Educ. § 6-201(c) for the proposition that Gaddis had the authority to hire and terminate Sutton. ECF 31-1 at 5, ¶ L. However, the section appears to apply only to hiring. In my reading of the statute, § 6-202(a)(1) governs termination.

requiring a visit to an emergency room. *Id.* at 1. Moreover, the injured student claimed that she reported the occurrence to Borden, who "did nothing about it." *Id.* at 1. Sutton advised Borden that he was being "suspended from driving a school bus pending further investigation." *Id.*

According to the suspension letter, the video showed that while the bus was in motion, students were "walking up and down the aisle, hitting each other with rolled up paper, climbing over the seats, hanging out the window" and Borden "never corrected this behavior . . . ." ECF 31-7 at 1. Borden's "failure to . . . correct[] the behavior of the students on [his] bus made [it] an unsafe bus." *Id.* As a result, Borden was notified that he would be "disqualified from driving a school bus" if he did not "agree to attend a driver improvement class by November 30, 2015." *Id.* at 1-2.

Borden did not agree to attend the class. Therefore, Sutton submitted a Disqualification Form to the Maryland State Department of Education ("MSDE") on December 15, 2015. ECF 31-6 at 7; ECF 31-8 (Disqualification Form); ECF 36-14 (same). As the reason for "Disqualification," Sutton stated: "Refusal to attend a driver improvement class on pupil management." ECF 31-8; ECF 36-14. Sutton notified Borden of his disqualification. ECF 31-6 at 7; ECF 36-14 at 5.

Referencing COMAR §§ 13A.06.07.07D and 13A.06.07.08C, the MSDE Disqualification Form states: "Any local school system has the discretion to reinstate an individual disqualified for Unsafe Actions . . . by submitting a letter in writing to the Department's Office of Pupil Transportation." ECF 31-8; ECF 36-14.

On Saturday, April 30, 2016, while Sutton was out of town, he received a call from Bernard Johnson, the Board's driver trainer, advising that a bus contractor needed a substitute driver for Monday, May 2, 2016. ECF 22, ¶ 16. Johnson recommended Borden, and Sutton

agreed to the suggestion. *Id.* ¶ 17. The decision was made without any written request to reinstate Borden, so as to authorize him to operate a school bus in which SCPS students were to be transported. ECF 31-6 at 10; ECF 31-11 (letter from Sutton to Sumpter dated May 23, 2016) at 1; ECF 36-3 (Hearing of September 13, 2016) at 35-37. As a result, on Monday, May 2, 2016, Borden operated a school bus to transport SCPS students, even though he was in a disqualified status. ECF 31-6 at 10-11.

In the late morning of May 2, 2016, after Borden had already operated the school bus to transport students to school, Sutton was reminded by one of his subordinates that Borden was disqualified from driving a school bus. ECF 36-3 at 38. Sutton claims that until this point he had forgotten that Borden was disqualified. ECF 31-11 at 1; ECF 36-3 at 38. When reminded, Sutton promptly endeavored to have Borden reinstated and directed that Borden be administered the driver improvement course, which he had previously refused to take. ECF 36-15 (email chain of May 2, 2016 to May 3, 2016), at 2. At some point on May 2, 2016, after Borden had already driven the school bus, he agreed to take the required safety course, and did so. ECF 31-11 at 1; ECF 36-3 at 38-39.

Thomas Davis, the Deputy Superintendent of the SCPS system, issued a memorandum to Gaddis on May 3, 2016, regarding Sutton's decision to allow Borden to operate a school bus the previous day. ECF 31-3 at 6, 30-31; ECF 36-11. On that date, Gaddis met with Sutton and Davis to discuss the events of May 2, 2016, and Sutton was placed on paid administrative leave, pending an investigation. ECF 31-3 (Affidavit of Davis), at 6-7; ECF 36-3 (Sutton Deposition), at 41-43.

Gaddis wrote a letter to Sutton on May 3, 2016. ECF 31-3 at 38. He confirmed Sutton's suspension due to Sutton's "complete lack of sound judgment" in regard to his decision "to use Mr. Borden as a substitute and the implications from utilizing a disqualified driver."

At his deposition, Sutton recalled that at his meeting with Gaddis, the Superintendent told him that he (Sutton) "had put the school system in jeopardy, by allowing Mr. Borden to drive the school bus." ECF 36-3 at 41. Sutton also testified as to his explanation, *id.*: "And then I told him that, I just forgot. I wasn't feeling well." *Id.* According to Sutton, Gaddis responded: "That's no excuse." *Id.*

By letter of May 4, 2016, Davis asked the MSDE to remove Borden from MSDE's disqualified driver list and to reinstate him to operate school buses for the County. ECF 31-3 at 7, ¶ 27; ECF 31-3 at 39. The MSDE granted this request. ECF 31-3 at 7, ¶ 27; *id.* at 40; *see also* ECF 36-16 (Sutton Deposition), at 6.

Davis conducted the investigation, at the direction of Gaddis. The investigation revealed that before Sutton authorized Borden to operate the school bus on May 2, 2016, Sutton failed to follow the proper MSDE procedure for reinstating Borden. ECF 31-3 at 32-37. Although Borden was disqualified at the relevant time, he was found to have operated the school bus in a safe manner. ECF 31-3 at 6, ¶ 25; ECF 36-3 at 28-29.

Gaddis issued a letter of termination to Sutton on May 17, 2016, effective June 30, 2016. ECF 36-11; *see* ECF 36-3 at 44. The letter of termination outlined a number of issues with Sutton's performance, but focused primarily on Sutton's decision to allow Borden to drive a school bus on May 2, 2016, while he was disqualified. *Id.* at 2. Gaddis characterized Sutton's decision as an "error in judgment," and noted that this decision "placed the contractor and the

Somerset County Public School system in grave jeopardy," resulting in a "measure of liability" that was "truly unacceptable." *Id.*

On May 23, 2016, Sutton appealed Gaddis's termination decision to the Board. ECF 31-11; ECF 36-17. He maintained that he "did not knowingly allow a disqualified driver to operate a school bus." *Id.* at 2. Sutton also recounted the unexpected need for a driver on May 2, 2016, and explained that he forgot that he had required the driver improvement class, even though this was at Sutton's discretion. *Id.* Sutton added that as soon as the oversight was brought to his attention, he rectified the error. *Id.* Further, Sutton said: "Again, if I had known that the driver had been disqualified, I would never have given the authorization for him to drive. However, what I find odd is that the driver is now driving, yet I am being recommended for termination." *Id.*[4]

The Board held a hearing on September 13, 2016, regarding Sutton's appeal. ECF 36-3. It was conducted by Robert Eaton, Esquire, who served as the Hearing Examiner. ECF 31-12 at 1. At that hearing, Gaddis testified that Sutton's decision to allow Borden to drive while disqualified was the catalyst for his termination. ECF 36-3 at 5-6, 9-10, 26-27.[5]

The Hearing Examiner issued Findings of Fact and Conclusions of Law, concluding that the termination was not arbitrary, unreasonable, or illegal. ECF 36-12 at 1-3.[6] At oral argument on December 9, 2016, the Board granted Sutton's request to reopen the evidence, so that Sutton could introduce another exhibit. *Id.* Thereafter, the Hearing Examiner considered the additional

---

[4] Sutton also addressed other allegations made by Gaddis. ECF 36-17 at 2-3.

[5] Testimony of Sutton was referenced in earlier portions of the factual summary.

[6] The parties did not include the findings of the Hearing Examiner as an exhibit.

evidence, but reached the same conclusion. *Id.* at 2. At Sutton's request, the Board heard oral argument on March 31, 2017. *Id.*

On July 20, 2016, Sutton was replaced by Michael Bartemy, who is Caucasian. Sutton maintains that Bartemy had "virtually no relevant experience, training or education." ECF 36-1 at 16. Further, according to plaintiff, the terms of Bartemy's employment "were significantly more favorable than those offered Mr. Sutton[.]" *Id.* Among other things, Bartemy received a higher salary and he was awarded the job on a permanent basis, in contrast to the interim appointment initially awarded to Sutton. *Id.* at 17.

On September 15, 2016, during the pendency of Sutton's appeal to the Board, Sutton filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), claiming he was fired because of his race. ECF 31-4. On December 9, 2016, the EEOC issued a Dismissal and Notice of Right to Sue, finding that it was "unable to conclude that the information obtained establishes violations of the statutes." ECF 31-5. This suit followed on February 21, 2017. ECF 1.

On April 18, 2017, the Board ruled on Sutton's appeal, issuing a written opinion upholding Gaddis's decision to terminate Sutton's employment. ECF 31-12. Sutton appealed the decision to the Maryland State Board of Education ("MSBE"). On July 18, 2017, the MSBE stayed the appeal, pending the outcome of this case. ECF 31-13.

Additional facts are included in the Discussion.

## II. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S.

317, 322–24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied,* 514 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322–24. Moreover, in resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. Ltd.*,

475 U.S. at 587; *accord Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The judge's "function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Moreover, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

However, to defeat summary judgment, conflicting evidence must give rise to a *genuine* dispute of material fact. *Anderson*, 477 U.S. at 247–48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Sharif*, 841 F.3d at 204. Conversely, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*

### III.    Discussion

As noted, Sutton has sued Gaddis and the Board under Title VII, as well as 42 U.S.C. §§ 1981 and 1983, alleging racial discrimination.  ECF 22.

Under Title VII, "it shall be an unlawful employment practice for an employer to . . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1).  *See Young v. United Parcel Service, Inc.*, ____ U.S. ____, 135 S. Ct. 1338, 1344 (2015); *DeMasters v. Carilion Clinic, et al.*, 796 F.3d 409, 416 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).

Section 1981(a) provides: "All persons within the Jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ."  Section 1981(b) states: "For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.*  And, "when suit is brought against a state actor, § 1983 is the 'exclusive federal remedy for violation of the rights guaranteed in § 1981.'" *Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989)).

Like Title VII, 42 U.S.C. § 1981 prohibits, *inter alia,* "discrimination in employment on the basis of race." *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 551-52 (4th Cir. 2006); *see Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975) ("§ 1981 affords a federal remedy against discrimination in private employment on the basis of race"); *Nnadozie v.*

*Genesis Healthcare Corp.*, ___ Fed. App'x ___, 2018 WL 1830935 (4th Cir. April 17, 2018), at
*4. Section 1981(b) was enacted as part of the Civil Rights Act of 1991 in order to overrule
legislatively the Supreme Court's holding in *Patterson v. McLean Credit Union,* 491 U.S. 164
(1989), and to ensure that § 1981 applied not "only to the formation of a contract" but also "to
conduct by the employer after the contract relation has been established, including breach of the
terms of the contract or imposition of discriminatory working conditions." *Patterson*, 491 U.S. at
176-77; *see CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 449-51 (2008) (discussing post-
*Patterson* enactment of § 1981(b)).

Claims of racial discrimination brought under these two statutes are assessed according to
the same standard. *See Guessous*, 828 F.3d at 217; *Boyer-Liberto*, 786 F.3d at 281; *James v.
Booz-Allen Hamilton, Inc.*, 368 F.3d 371, 375 n.1 (4th Cir. 2004); *see also Love–Lane v. Martin,*
355 F.3d 766, 786 (4th Cir. 2004) (stating, in case involving employment discrimination claim
under Title VII, § 1981, and § 1983, that "the elements required to establish such a case are the
same under all three statutes") (citing *St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502, 506  n.1
(1993)).  "Procedurally, however, Section 1981 claims are not subject to the same exhaustion
and timeliness requirements as those asserted pursuant to Title VII." *Sewell v. Strayer Univ.*, 956
F. Supp. 2d 658, 673 (D. Md. 2013) (citing *White v. BFI Waste Servs., LLC,* 375 F.3d 288, 291-
92 (4th Cir. 2004)).

In general, there are "two avenues" *at trial* by which a plaintiff may prove a violation of
Title VII and other employment discrimination statutes.  *Hill v. Lockheed Martin Logistics
Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc) (recognized in *Foster v. Univ. of
Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015), as *abrogated on other grounds by Univ.
of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)); *see Love–Lane,* 355 F.3d at 786 (stating

that "the *McDonnell Douglas* framework, developed for Title VII, has been used to evaluate race discrimination claims under the three statutes," *i.e.,* Title VII, § 1981, and § 1983); *see also*, *e.g.*, *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 263 n.* (4th Cir. 2008) ("[T]he *McDonnell Douglas* framework applies to discrimination claims under...§ 1981.").

The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997). The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Young*, 135 S. Ct. at 1345 (construing the Pregnancy Discrimination Act); *Guessous*, 828 F.3d at 216 (discussing the three steps of the *McDonnell Douglas* framework).

The *McDonnell Douglas* proof scheme is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion [at trial] never 'shifts' from the plaintiff," who must prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted). Notably, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

If the plaintiff chooses to proceed at trial under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Central Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017). Although the precise formulation of the required prima facie

showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an applicant "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Hurst v. District of Columbia*, 681 F. App'x 186, 189-90 (4th Cir. 2017) (per curiam). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. The plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trustees of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

Conversely, if the defendant does not submit evidence of a legitimate basis for its actions, the factfinder may "infer discriminatory animus because experience has proved that in the

absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978). And, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," then "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

As noted, these two approaches establish the common methods by which a plaintiff may prove intentional employment discrimination *at trial*. *See Burns*, 96 F.3d at 731. At this stage, however, these approaches merely serve to inform a court's evaluation of the Motion. *Cf. Pettis v. Nottoway Cty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas* . . . .").[7]

In a termination case under Title VII,

the plaintiff has the initial burden to establish a prima facie case, which she may do by showing that (1) she is a member of a protected class; (2) she suffered

---

[7] In *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002), the Supreme Court explained that the "prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement." The Court stated that it had "never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Id.* at 511. Thus, the Court said: "[A]n employment discrimination plaintiff need not plead a prima facie case of discrimination . . . ." *Id.* at 515; *see also McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 584 (4th Cir. 2015), *cert. denied*, 136 S. Ct. 1162 (2016).

adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class.

*Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011) (internal citation omitted).

If the plaintiff meets this burden, "the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* (internal citation omitted). If the employer meets its burden, the burden then shifts back to the plaintiff to show that "the employer's stated reasons were not its true reasons, but were a pretext for discrimination." *Id.* (internal citation omitted).

To be sure, Sutton, an African-American, is a member of a protected class. Moreover, his termination constitutes an adverse employment action. Therefore, he readily established the first two elements. The court will assume, *arguendo*, that Sutton can also establish the remaining elements. *See*, *e.g.*, *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (2007). Therefore, the burden shifts to defendants to show a valid, nondiscriminatory reason for the decision to terminate plaintiff.

Defendants have articulated a nondiscriminatory basis for the termination: Sutton allowed a disqualified bus driver to operate a county school bus. Therefore, the burden shifts to plaintiff to demonstrate that the termination was a pretext for race discrimination.

In the light most favorable to Sutton, he mistakenly allowed Borden, who was then a disqualified driver, to operate a school bus, because he forgot that Borden had been disqualified. No untoward incidents occurred; the bus was driven safely; and Borden was promptly reinstated after completing a safety course.

Under the third element, the plaintiff must show he was "performing [his] job duties at a level that met [his] employer's legitimate expectations at the time of the adverse employment

action." *Bonds*, 629 F.3d at 386 (internal citation omitted). In making this judgment, "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996) (internal citation omitted); *see also McZeke v. Horry County*, 609 F. App'x 140, 144 (4th Cir. 2015) (stating that it "is the perception of the decision maker which is relevant when determining whether a plaintiff's job performance met her employer's legitimate expectations") (internal citations omitted). The plaintiff's "own testimony, of course, cannot establish a genuine issue as to whether [he] was meeting [his employer's] expectations." *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).

Defendants readily established a non-pretextual basis for Sutton's termination. Even assuming that Sutton's conduct prior to April 30, 2016, met his employer's expectations, the record demonstrates that Sutton was terminated because he did not meet the Board's legitimate expectations at the time he was fired.

Sutton admits that on April 30, he "authorized Borden to operate a school bus in which . . . students were to be transported." ECF 31-6, ¶ 34. And, he did so even though, "on or about December 15, 2015, [he had] submitted an executed Disqualification Form [for Borden] to the Maryland State Department of Education," ECF 31-6, ¶ 24, disqualifying Borden from driving buses for the school district based on (1) video evidence that Borden had operated "an unsafe bus" and (2) Borden's refusal to attend a driver improvement class to learn how to operate a bus in a safe manner. ECF 31-6, ¶ 23. As a result of Sutton's April 30 decision, "on May 2, 2016, prior to being removed from MSDE disqualification status, Mr. Borden operated a school bus in which he transported . . . students." ECF 31-6, ¶¶ 34-35.

By letter of May 17, 2016 (ECF 36-11), Gaddis wrote to Sutton, notifying him of his termination. Gaddis recounted, ECF 36-11 at 2:

> On May 3, 2016 we discussed at length your error in judgment when you assigned a disqualified driver to operate a school bus on May 2, 2016 without their completion of mandated Driver Improvement training or proper approval from the Maryland State Department of Education (MSDE). The decision placed the contractor and the Somerset County Public School system in grave jeopardy by having a disqualified driver operating one of our school buses. The measure of liability associated with this decision is truly unacceptable.

When Gaddis was asked at the hearing on September 13, 2016, about the catalyst for terminating Sutton, Gaddis stated: "There had been some issues, as we had worked throughout the school year, but the decision of allowing a disqualified driver to drive a bus in my eyes was unforgivable and a grave mistake because of the jeopardy that it put our students in." ECF 36-3 at 5-6. Later at the same hearing, Gaddis reiterated that "the catalyst for [his] decision to fire Mr. Sutton" was Sutton's "handling of this disqualification issue," *i.e.*, "letting a disqualified driver drive the bus." ECF 36-3 at 9-10.

The Board's expectations in this regard were legitimate. Indeed, the MSBE noted in its order staying Sutton's administrative appeal pending the outcome of this litigation:

> [A]llowing a disqualified bus driver to operate a school bus is an egregious error for an employee in [Sutton's] position. The Supervisor of Transportation and Operations is ultimately responsible for ensuring the safe operation of the school system's transportation services and entrusted with protecting the safety and well-being of students who use those services. Assigning a disqualified bus driver to operate a school bus places students at serious risk of injury and creates liability issues for the school system.

ECF 31-13 at 1, n. 1.

The Board offered a legitimate reason for terminating Sutton. Where an employer offers such a reason, the burden shifts to the plaintiff to prove "*both* that the reason was false, *and* that

discrimination was the real reason for the challenged conduct." *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995) (internal citation omitted). Sutton can prove neither.

Sutton seems to urge a "no harm, no foul" analysis. He observes that "no damage, harm or loss ensued on May 2," and he points out that Borden has since undertaken safety training and therefore has been removed from the disqualified list and reinstated. ECF 36-1 at 17; ECF 31-6, ¶ 23. Sutton also observes that "no evidence was presented at the hearing, (or during the course of discovery) to demonstrate how Mr. Borden . . . 'put the County at risk' when he drove on May 2," because no untoward event occurred involving Borden on that date. ECF 36-1 at 17.

But, at the relevant time, Borden was disqualified from driving because he had previously "operated an unsafe bus" and then refused to undergo remedial training. That Borden safely operated the bus is of no moment. The ends do not justify the means.

Sutton candidly acknowledged that he authorized Borden to drive the school bus because he "forgot" that Borden was disqualified. ECF 36-3 at 42. Perhaps another employer would have been more forgiving of a human error. But Gaddis's decision not to overlook such a serious error by the Supervisor of Transportation and Operations does not amount to race discrimination.

Sutton allowed Borden to drive a bus filled with school children, while disqualified, which could have created serious liability issues for the school system, thereby putting it at risk of financial injury. Injury need not materialize for the conduct to be deemed unacceptable. And, the fact that an employee is deemed qualified for a job *after* participating in safety training does not mean he was qualified for the job *before* participating in safety training, especially where that employee's earlier refusal to participate in safety training was part of the reason he was disqualified in the first place.

The record indicates that Sutton's decision on April 30 was both serious and taken seriously by the Board. There is nothing in the record to indicate that this decision was *not* the real reason Sutton was terminated, or that Sutton was actually fired because of his race. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) ("[W]hen an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, 'it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination'") (citation omitted).

The only evidence Sutton offers that his termination was racially motivated is (1) the fact that his replacement is White and was treated better than he was, ECF 36-1 at 22, and (2) his own Declaration that "since Dr. Gaddis has become Superintendent, there are approximately half as many African Americans employed as supervisors and administrators by the Board," ECF 36-1 at 23; ECF 36-5, ¶ 27.

Even if Sutton's replacement was treated favorably compared to Sutton, there is no evidence whatsoever that *race* was the basis for this favorable treatment. And, even assuming that Sutton's uncorroborated claim regarding the reduction in employment of African-Americans is true, that fact, standing alone, is not sufficient evidence of pretext. *See Bostron v. Apfel*, 104 F. Supp. 2d 548, 554 (D. Md. 2000) ("Decisions of this Court and of the Fourth Circuit indicate that statistical evidence has little, if any, relevance in an individual disparate treatment action. Statistics alone are not sufficient to prove pretext in individual disparate treatment cases.") (internal citations omitted), *aff'd*, 2 F. App'x 235 (4th Cir. 2001).

Sutton was fired because he erred in discharging his considerable responsibilities, and not because of his race. In this regard, it is noteworthy that Gaddis himself hired Sutton just over two years before terminating him. And, "the fact that the employee was hired and fired by the

same person within a relatively short time span . . . creates a strong inference that the employer's stated reason for acting against the employee is not pretextual." *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991). The Fourth Circuit has previously applied this "same actor inference" both in the Title VII context, *see Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996); *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1130 (4th Cir. 1995), and where the time span between an employee's hiring and firing was two years. *See Tyndall v. Nat'l Educ. Centers, Inc. of California*, 31 F.3d 209, 211, 214-15 (4th Cir. 1994).

For each of these reasons, even if Sutton could make out a prima facie case of race discrimination, the Board would be entitled to summary judgment because Sutton has offered no credible evidence that the Board's proffered reason for terminating him was pretextual.

I note that the parties previously raised, *see* ECF 23, 25, 26, and incorporate here by reference, *see* ECF 31-1 at 3 n.2; ECF 36-1 at 12, arguments regarding defendants' immunity from Sutton's claims under Section 1983. Because Sutton suffered no racial discrimination, I need not reach this issue.[8] *See Pearson v. Callahan*, 555 U.S. 223, 236-42 (2009) (granting courts flexibility in the qualified immunity context to decide the issues in the order they deem

---

[8] Although a court must satisfy itself of its own jurisdiction in the first instance, *see Mitchell v. Maurer*, 293 U.S. 237, 244 (1934), a state actor's immunity from suit under Section 1983 is nonjurisdictional. *See In re Mills*, 287 F. App'x 273, 278 (4th Cir. 2008). And, this makes good sense. Not only does Eleventh Amendment immunity *itself* appear to be nonjurisdictional, *see Wisconsin Dept. of Corrections v. Schacht*, 524 U.S. 381, 389 (1998) (the Eleventh Amendment "does not automatically destroy original jurisdiction" but rather "grants the State a legal power to assert a sovereign immunity defense should it choose do so," which the State can waive and which the court can ignore if not raised by the State) (internal citations omitted), but a state actor's immunity from suit under Section 1983 is best understood to be a matter of statutory construction rather than of Eleventh Amendment immunity. *See Will v. Michigan Dept. of Police*, 491 U.S. 58, 66-67 (1989) ("Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity" and therefore, although "the scope of the Eleventh Amendment and the scope of § 1983" are "separate issues," in "deciphering congressional intent as to the scope of § 1983, the scope of the Eleventh Amendment is a consideration, and we decline to adopt a reading of § 1983 that disregards it").

best, noting that "the judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case" and that "[i]n other analogous contexts, we have appropriately declined to mandate the order of decision that the lower courts must follow").

## IV.    Conclusion

For the foregoing reasons, no reasonable jury could find that Sutton was terminated because of his race.  Accordingly, I shall grant defendants' motion for summary judgment.

An Order follows.


 June 18, 2018                                              _____/s/_____
Date                                                        Ellen L. Hollander
                                                            United States District Judge